[Cite as *In re G.H.*, 2023-Ohio-295.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

In re G.H.                                          Court of Appeals No.  OT-22-009

S.H.                                                Trial Court No.  2021-JUV-384

       Appellant

v.

J.F.                                                **DECISION AND JUDGMENT**

       Appellee                                     Decided:  January 30, 2023

* * * * *

Howard C. Whitcomb, III, for Appellant.

J.F., Pro se.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from the January 19, 2021 judgment of the Ottawa County

Court of Common Pleas, Juvenile Division, transferring jurisdiction to Boone County,

Kentucky.  For the following reasons, this court reverses the judgment of the trial court

and remands the case back to the trial court for proceedings consistent with this opinion.

**Facts and Procedural History**

{¶ 2} The record reflects that this juvenile custody action was commenced on August 23, 2021, when a complaint for custody of G.H., pursuant to R.C. 2151.27(D), was filed by appellant, S.H., and emergency custody was awarded to appellant on the same day. In his affidavit filed with his complaint, S.H. asserted that he was listed as G.H.'s father on the birth certificate and that he has been the primary provider for the care of G.H. from birth until present.

{¶ 3} On August 24, 2021, appellee, J.F., mother of G.H., filed an emergency motion to vacate the emergency custody order. Proof of Kentucky school enrollment of the minor child was filed by mother on August 25, 2021. The magistrate appointed a guardian ad litem on August 27, 2021.

{¶ 4} On August 30, 2021, the magistrate ordered both parents to provide information required by the Uniform Child Custody Jurisdiction and Enforcement Act, or "UCCJEA." Mother then filed a motion for a paternity test, and motion to dismiss for lack of jurisdiction on September 7, 2021. The magistrate granted an in-camera interview of the minor child on September 8, 2021, and designated J.F. as the residential parent on the same day.

{¶ 5} The in-camera interview of the minor child occurred on September 10, 2021. On October 6, 2021, mother filed a motion to dismiss the proceedings for lack of

2.

standing.  On October 8, the magistrate granted S.H. parenting time with G.H.  Then, on October 6, 2021, a hearing began on the issues of jurisdiction and paternity.

{¶ 6} On the first day of the hearing, mother presented her case, calling her boyfriend, J.D., and herself, as witnesses.  J.D. started dating mother in July 2021, and he had accompanied her to drop-off and pick-up G.H. at his father's residence in Ottawa County.  Specifically, one evening in August 2021, the Sunday before G.H. was to begin first grade in Kentucky, he accompanied mother to pick up G.H. from father's residence.  Father and G.H. could not be located, therefore, the pair remained in Ohio until approximately 2:00 a.m. searching for G.H.  A missing child report was issued for G.H.  Once G.H. was located, he appeared angry and distressed, but that otherwise G.H. always appeared healthy, happy and taken care of in mother's care.

{¶ 7} Mother then testified that she has been the sole provider of medical, dental, and vision care as G.H. is provided insurance by the state of Kentucky as a resident there.  She also provides education expenses for G.H. when he is in her care.  Because S.H. has a larger family than mother's, and her own extended family live in Toledo, birthday parties were often held for G.H. in Ottawa County, and her own mother would mail birthday cards for G.H. to father's home instead of her own.

{¶ 8} Mother continued testifying that S.H. is not G.H.'s biological father, and in fact, on cross-examination, she stated a man named T.N. is the biological father.  Mother informed S.H. of this prior to G.H.'s birth, and S.H. still signed G.H.'s birth certificate.

3.

Furthermore, G.H.'s middle-name is the same as S.H.'s first name.  After G.H.'s birth, all three lived together in Genoa, Ohio, for approximately a month or two before they moved to Kentucky.  After residing in Kentucky for approximately a month, her relationship with S.H. ended and he moved back to Ohio, but G.H. remained with her in Kentucky.

{¶ 9} No custody arrangements were made for G.H. as the parties were never married, but G.H. would frequently visit S.H. in Ohio.  Furthermore, no child support has been provided for G.H.  However, mother has permitted S.H. to claim G.H. as a dependent on his income taxes since G.H. was born in 2014.

{¶ 10} S.H. then presented his case, calling himself, his sister – Sh. H., his mother – M.J.H., babysitters B.B., H.T., school administrators M.S. and C.S., a neighbor – C.P., stable owner E.P., mother's sister S.B., and attorney C.M. as witnesses.

{¶ 11} On direct examination, S.H. testified that G.H. has resided with him from September 2015 to the present in Ottawa County, and that mother has from time to time visited with G.H.  Appellant's tax returns for the years 2014 through 2020, in which G.H. was claimed as appellant's dependent child, were admitted as evidence.  S.H. also admitted preschool attendance records from September 2018 until May 2019, from Trinity Lutheran, a preschool in Elmore, Ohio.  Proof of enrollment at Woodmore Elementary School in Ottawa County from 2019 until 2021 was also admitted.  Furthermore, an Independent Education Plan ("IEP"), dated October 11, 2019, was admitted.  S.H.'s signature was on the document indicating that he attended the meeting.

4.

{¶ 12} Birthday and Christmas cards sent from appellee's mother to appellant's residence for G.H. were also admitted. S.H. testified that he never possessed any medical card from Kentucky for the care of G.H, and that any medical expenses were paid at his own expense.

{¶ 13} On cross-examination, appellant stated that he was aware of G.H.'s school enrollment in Kentucky for the fall of 2021, and that there had been a discussion that appellant would stay at the residence of J.F. for the first few days of G.H.'s school year. He went on to testify that mother had "enrolled [G.H.] in Kentucky against what we stated amongst each other on the phone. And again, like I said, I was in fear that I was going to lose my son to be in Kentucky." Appellant did admit that mother had taken G.H. for regular vaccinations, yearly physical exams, and dental care and that the state of Kentucky covered those expenses.

{¶ 14} S.H. also testified that he was aware that G.H. was not his biological child, and he learned of this shortly after he and mother began dating. He also was also not able to recall where G.H. attended school after the beginning of 2019, but admitted that for the majority of 2021, G.H. resided with mother.

{¶ 15} Following redirect examination of S.H., the court determined that there was no remaining time to continue the hearing, and testimony for the day was concluded.

{¶ 16} The second day and final day of the hearing was held on November 3, 2021, nearly a month later. At the beginning of the hearing, there was an agreement that

5.

mother would recall appellant for additional cross-examination. The hearing then began with the direct examination of M.J.H., mother of appellant.

{¶ 17} M.J.H. testified that appellant lives with her, and that G.H. has resided with them continuously since 2015, when G.H. was ten months old. During that time, until G.H. was three years old, visitation with mother was sporadic. M.J.H. worked second-shift at the Ottawa County Sheriff's Office, and she was able to care for G.H. However, during times that both she and appellant were working, three babysitters – B.B., H.T., and S.K. would care for G.H. G.H. attended preschool in 2019, and was registered for kindergarten, but only attended kindergarten virtually due to the pandemic. According to M.J.H., visitation became more frequent with mother in March or April of 2021. As for the current dispute, M.J.H. testified that G.H. went for a visit with his mother and she would not bring him back. Therefore, S.H. filed a motion for custody.

{¶ 18} On cross-examination, with respect to the evening that mother and J.D. came to pick-up G.H., and he could not be located, M.J.H. was unable to reach S.H. because his phone was left at her residence. When G.H. came to visit that weekend, she knew that S.H. had no intention of returning G.H. to her to begin school in Kentucky and that she had concerns of G.H. being neglected in mother's home.

{¶ 19} The next witness was B.B. – a babysitter of G.H., who resides in Ottawa County, and babysat G.H. for a total of four weeks in 2015, 25 weeks in 2016, and 27 weeks in 2017. On cross-examination, she testified that she never had contact with

6.

mother and provided her tax identification number and total amounts paid for care so that S.H. could report it on his tax returns.

{¶ 20} H.T. – another care provider located in Ottawa County testified that she provided babysitting services for G.H. in 2016, every weekday, for approximately three months during the summer.

{¶ 21} S.K. – father's sister, testified that she babysat for G.H. in 2018 and 2019, and early 2020, Monday through Friday, from approximately 7:00 to 8:00 a.m. to 5:00 p.m., for 48 weeks each year. She stopped providing daycare services during the COVID-19 pandemic because father and his girlfriend at the time, were no longer working and cared for G.H. She would see mother when she would come to pick up G.H. and at G.H.'s birthday parties. As for visits with mother, G.H. would visit mother sometimes for two weeks at a time, but that G.H. would typically return after one week.

{¶ 22} M.S., an administrator of Trinity Lutheran Preschool, testified that G.H. attended preschool there in 2018-2019, where he attended class on Tuesdays and Thursdays, from 9:00 a.m. to 11:30 a.m. M.S. recalled on one occasion that G.H. went to visit mother and that father paid for preschool.

{¶ 23} C.M., and attorney, testified that he has represented various members of father's family as well as mother's previous husband, and that he generally believed that G.H. resided with father.

7.

{¶ 24} C.P., a neighbor of father, testified next. His testimony revealed that he has two sons who would see G.H. daily, and that he was under the impression that G.H. lives with father. He could not recall G.H. being away for weeks at a time.

{¶ 25} S.B., sister of mother, then appeared by Zoom. She visited her sister a few times a year, and would talk via telephone at least every couple of weeks. She initially appeared for the first day of the hearings, on October 3, 2021, and has not had contact with her sister since that day. She believed she saw G.H. in the Spring of 2021, but that she had not seen him for several years prior when she would visit her sister. As far as the Spring visit, she recalled that mother took G.H. back to Ohio early. Her overall impression was that G.H. resided with father and that she had concerns about the stability of mother's home because mother moved frequently.

{¶ 26} E.P. next testified that he would see G.H. when father's girlfriend would come to his barn to rider her horse. He saw G.H. approximately fifteen to twenty times in 2021.

{¶ 27} C.S. – an administrator at Woodmore Local Schools testified that she knows father, and that G.H. was enrolled in the district from 2019 until his withdrawal in 2021. G.H. was identified as a child with a speech-related disability, and therefore, he was able to be enrolled in the school under federal guidelines despite not having any custody documents. State law would have required the school to have custody documents. She testified that despite G.H. being enrolled in the district, S.H. opted to

8.

provide homeschooling for G.H. in 2020 due to the pandemic. Furthermore, G.H. was enrolled in home school during kindergarten. Because G.H. was being home-schooled, the district was not required to provide services under the IEP. Notably, and for the first time mentioned by anyone in the hearing, C.S. indicated that court proceedings related to G.H. might be occurring in Kentucky, and that she had prepared a document for father to use at that hearing.

{¶ 28} Due to the surprising nature of the testimony, there was discussion between the guardian ad litem and the court, and father's attorney indicated that there was a hearing in Kentucky on October 26, 2021, which he learned from father.

{¶ 29} Following C.S.'s testimony, exhibits were admitted, father rested his case and the court recessed for a lunch break.

{¶ 30} Following the break, mother was permitted a re-cross-examination of father, which is labeled as re-direct testimony in the transcript. However, during his testimony, the guardian ad litem interrupted the proceedings and the magistrate announced the following regarding pending proceedings in Kentucky:

> [I]t has come to this Court's attention that a case of In The Matter Of: [G.H.] was filed in Boone County, Kentucky, even though, technically, it was alluded to today in testimony, but no one necessarily gave us notice of that. So, in the meantime, the Honorable Judge Bramlage from Boone County, Kentucky called. And so we spoke and it's my understanding she

recorded it and that's when I had to relay to the Honorable Judge Hany, who presides over this Court. So when there are two competing states and jurisdiction, the Supreme Court tells us that the judges are supposed to make contact with each other, discuss judicial economy, and which court should assume jurisdiction. So remember when this started, there was not a proceeding, or I was not notified of any other proceeding. You were saying they didn't have jurisdiction, Ohio didn't, but nothing, we didn't know that there was actually a case pending in Boone County, Kentucky.

MR. WHITCOMB: I don't know if there was, Your Honor.

[J.F.]: There was.

THE COURT: Correct, but there is now. And so the Honorable Judge Bramlage, myself, and Judge Hany have agreed that Boone County, Kentucky will assume jurisdiction. And we will put the primary reasons, primarily being one that Children's Services is involved, and child is physically residing there. So for their Children's Services to investigate, which they are currently in an investigation, it would be difficult for them to travel to Ohio to investigate. That's one.

Now, I will tell you, as I talked to Judge Bramlage, I believe the evidence, by clear and convincing evidence, shows the child resided in the Ottawa County area 2015, '16, '17, '18, '19, and that the evidence is murky

once we get to March of 2020. But before that, I think it's clear child was living here and going to school here, being babysat. I have a number of factors. So she is aware of that as the child did live here.

{¶ 31} The court went on to indicate that mother had filed a private action for dependency in Kentucky, and that neither the magistrate or judge in Ohio had yet to review the pleadings that were filed. The magistrate did indicate that jurisdiction might be returned back to Ohio if the court in Kentucky dismisses the dependency action, or if the judge in Kentucky ultimately awards father custody. The magistrate indicated that a decision with findings would be forthcoming and the proceedings ended.

{¶ 32} On November 12, 2021, the magistrate entered an "order," and on November 22, 2021, appellant filed a motion to "set aside" that order. In his motion, appellant also requested findings of fact and conclusions of law. On January 19, 2021, the trial court entered judgment on that order. The entirety of the January 19, 2021 judgments states,

A Juvenile Dependency/Neglect or Abuse Petition was filed by [mother] on October 18, 2021 in the Family Court of Boone County, Kentucky. The Petition alleged that [G.H.] is a dependent child. On November 5, 2021 (and again on November 16), the Court determined that the Commonwealth of Kentucky has jurisdiction over the child who is referenced above. In re: [G.H.], Boone County Kentucky Family Court,

54th Judicial Circuit, Division II, Case No. 21-00270-003 (See copies of that Court's Orders attached hereto.) In addition, due to Petitioner's allegations, that case takes priority over this civil matter.

**Assignments of Error**

{¶ 33} Appellant filed a notice of appeal from the January 19, 2021 judgment on February 18, 2021, and now sets forth the following three assignments of error:

I. THE TRIAL COURT MAGISTRATE VIOLATED APPELLANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY ARTICLE 1, SECTION 16 OF THE OHIO CONSTITUTION WHEN IT ABRUPTLY TRANSFERRED JURISDICTION OF THE CASE TO BOONE COUNTY, KENTUCKY

II. THE TRIAL COURT ABUSED ITS DISCRETION IN TRANSFERRING THE JURISDICTION OF THE CASE CONTRARY TO CIV. R. 53(D)(2)(a)(i)

III. THE TRIAL COURT MAGISTRATE'S DECISION TO TRANSFER THE JURISDICTION OF THE CASE TO BOONE COUNTY, KENTUCKY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE ADDUCED AT TRIAL

{¶ 34} We will review appellant's second assignment of error first because it is dispositive to this appeal.

**Analysis**

{¶ 35} Civ.R. 53(D)(2)(a)(i) states, "Subject to the terms of the relevant reference, a magistrate may enter orders without judicial approval if necessary to regulate the proceedings and if not dispositive of a claim or defense of a party."  Because this case originated in juvenile court, we turn to the Rules of Juvenile Procedure for additional guidance.

{¶ 36} Juv.R. 40 governs magistrates in juvenile court proceedings, and provides that magistrates are "authorized, subject to the terms of the relevant reference, to regulate all proceedings as if by the court and to do everything necessary for the efficient performance of those responsibilities * * *." Juv.R. 40(C)(2). The juvenile court refers a "particular case or matter or a category of cases or matter to a magistrate by a specific or general order of reference or by rule," and "may limit a reference by specifying or limiting the powers * * *." Juv.R. 40(D)(1)(b).  Furthermore, "[t]he designation of a magistrate's determination of an issue as a "magistrate's order" or "magistrate's decision" is not merely a matter of form, but rather one of substance."  *In re L.D.M.*, 12th Dist. Butler No. CA2020-07-078, 2021-Ohio-1853, ¶ 7, fn.1, citing *In re N.J.*, 12th Dist. Warren Nos. CA2016-10-086 and CA2016-10-090 thru Warren Nos. CA2016-10-091, 2017-Ohio-7466, ¶ 10, fn. 2.

{¶ 37} The issue with respect to father's second assignment of error is whether the magistrate's ruling was an order or a decision.  If it was an order, father would have

13.

had the option, to file a motion to vacate the order within ten days of the order being filed; on the other hand, if it was a decision, he would have had the ability to file objections to the decision within 14 days of the decision being filed. In this case, father treated the ruling as an order and filed a motion to "set aside" within ten days from the date of the magistrate's decision.

### *Orders Entered by a Magistrate*

{¶ 38} "Subject to the terms of the relevant reference, a magistrate may enter orders *without judicial approval* if necessary to regulate the proceedings and if not dispositive of a claim or defense of a party." (Emphasis added.) Juv.R. 40(D)(2)(a)(i). The rule provides the following as examples of matters upon which a magistrate may issue orders:

(A) Pretrial proceedings under Civ.R. 16;

(B) Discovery proceedings under Civ.R. 26 to 37, Juv.R. 24, and Juv.R.25;

(C) Appointment of an attorney or guardian ad litem pursuant to Juv.R. 4 and Juv.R.29(B)(4);

(D) Taking a child into custody pursuant to Juv.R. 6;

(E) Detention hearings pursuant to Juv.R. 7;

(F) Temporary orders pursuant to Juv.R. 13;

(G) Extension of temporary orders pursuant to Juv.R. 14;

(H) Summons and warrants pursuant to Juv.R. 15;

14.

(I)   Preliminary conferences pursuant to Juv.R. 21;

(J)   Continuances pursuant to Juv.R. 23;

(K) Deposition orders pursuant to Juv.R. 27(B)(3);

(L) Orders for social histories, physical and mental examinations pursuant

    to Juv.R. 32;

(M)Proceedings upon application for the issuance of a temporary protection

    order as authorized by law; [and]

(N) Other orders as necessary to regulate the proceedings.

Juv.R. 40(D)(2)(a)(iii).

{¶ 39} Juv.R. 40 further provides that "[a]ny party may file a motion with the court to set aside a magistrate's order [and] [t]he motion * * * shall be filed not later than ten days after the magistrate's order is filed." Juv.R. 40(D)(2)(b).

{¶ 40} Therefore, "a magistrate's ability to issue orders is limited to regulatory, non-dispositive orders." *In re: H.R.K.,* 8th Dist. Cuyahoga No. 97780, 2012-Ohio-4054, ¶ 8; *J & B Fleet Indus. Supply, Inc. v. Miller,* 7th Dist. Mahoning No. 09 MA 173, 2011-Ohio-3165, ¶ 30 (magistrates may issue orders regulating discovery); *Campbell v. Pryor,* 5th Dist. Stark No. 2010CA00231, 2011-Ohio-1222, ¶ 40 (magistrate cannot issue order sentencing party to jail term, but instead may only make recommendation to the trial court as to the sentencing); *Beagle v. Beagle,* 10th Dist. Franklin No. 07AP-494, 2008-Ohio-764, ¶ 12 (magistrates may issue *temporary* support orders).

15.

### *Decisions Entered by a Magistrate*

**{¶ 41}** Juv.R. 40(D)(3) governs a magistrate's decision. The rule requires a magistrate to issue a decision when deciding "any matter referred under Juv.R. 40(D)(1)." Juv.R. 40(D)(3)(a)(i). Subsection (D)(1)(a) references subsection (C)(1), which sets forth the scope of a magistrate's authority to do any of the following:

> (a) *Determine any motion* in any case, except a case involving the
>
> determination of a child's status as a serious youthful offender;
>
> (b) *Conduct the trial* of any case that will not be tried to a jury, except the
>
> adjudication of a case against an alleged serious youthful offender;
>
> (c) Exercise any other authority specifically vested in magistrates by statute
>
> and consistent with this rule. (Emphasis added.)

**{¶ 42}** After a magistrate issues his or her written decision, a party may file written objections to the decision within 14 days of the filing of the decision. Juv.R. 40(D)(3)(b)(i). If a party objects to a magistrate's factual finding, the trial court *must* conduct an "independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." Juv.R. 40(D)(4)(d).

**{¶ 43}** The independent review requires the trial court to conduct a de novo review of the facts and an independent analysis of the issues to reach its own conclusions about the issues in the case. *In re T.J.*, 2021-Ohio-4085, 180 N.E.3d 706, ¶ 42 (6th Dist.),

citing *Barker v. Barker*, 6th Dist. Lucas No. L-00-1346, 2001 WL 477267, *3 (May 4, 2001) (An independent review is "the equivalent of a de novo determination.").

{¶ 44} Furthermore, unlike a magistrate's order, a magistrate's decision is not effective until adopted by the trial court. Juv.R. 40(D)(4)(a).

{¶ 45} In this case, it is evident the trial court treated the magistrate's November 12, 2021 ruling as an "order" because the January 19, 2021 order dismissing the complaint states, "On November 5, 2021 (and again on November 16), the Court determined that the Commonwealth of Kentucky has jurisdiction over the child who is referenced above." However, because the motions of mother were referred for trial before the magistrate, and the magistrate's ruling disposed of mother's motion to dismiss for lack of jurisdiction, the magistrate's ruling was substantively a decision under the rules. Juv.R. 40(D)(3).

{¶ 46} Although the trial court later entered an order on the decision, the trial court did not "undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law" as required under Juv.R. 40(D)(4)(d). In fact, the magistrate has not yet entered findings of fact or conclusions of law as requested in appellant's November 22, 2021 motion, and the decision has not yet been "adopted" by the court as required by Juv.R. 40(D)(4)(a).

17.

**{¶ 47}** Therefore, appellant's second assignment of error is sustained. Because our disposition of the second assignment of error renders the first and third assignments of error premature, we do not consider them.

## Conclusion

**{¶ 48}** Accordingly, the trial court's judgment dismissing father's complaint and transferring the matter to Kentucky is reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion. The costs of this appeal are assessed to appellee pursuant to App.R. 24. It is so ordered.

Judgment reversed,
and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                    _____
                                                                    JUDGE

Thomas J. Osowik, J.

                                                         _____
Christine E. Mayle, J.                                   JUDGE
CONCUR.

                                                         _____
                                                                    JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.